FILED IN DISTRICT COURT
OKLAHOMA COUNTY

## IN THE DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

JUL 2 0 2018

RICK WARREN
COURT CLERK

92

| | | |
|---|---|---|
| Stephen Brown, a single Individual | ) | |
| | ) | |
| Plaintiff | ) | **CJ No. 2018-3944** |
| | ) | |
| vs. | ) | |
| | ) | |
| Elephant Talk North America Corporation,   and | ) | |
| and Elephant Talk Communications Corp., | ) | |
| | ) | |
| Defendants | ) | **ATTORNEY LIEN CLAIMED** |

### VERIFIED COMPLAINT

COMES NOW the Plaintiff, and, allege and state as follows:

### JURISDICTIONAL MATTERS

1.    Plaintiff Stephen Brown is a resident of Oklahoma County, Oklahoma.

2.    Defendant Elephant Talk North America Corporation, is a Delaware Corporation ("ETNA") owned and operated by Elephant Talk Communications Corp. (listed on the exchange under the ticker "ETAK"), and registered to do business in the State of Oklahoma.   At all times relevant, Defendant's principal office in the United States of America was at 9705 N. Broadway Ext, Suite 200, Oklahoma City, OK 73114 and 3600 NW 138th St STE. 102 Oklahoma City, OK 73134. 3.

3.    ETCC, is a corporation organized under the laws of the State of Delaware with its principal place of business in New York, New York, was officed in Oklahoma City up to 2015, and is a party to the Purchase Agreement.   ETCC made a joint promise regarding compensation to Plaintiff pursuant to 15 Okla. Stat. § 175, and is therefore a party to this action.   Alternatively, ETCC is the real party in interest, and ETNA is an Alter Ego of ETCC.   Alternatively, ETNA is an instrument of fraud and a device created by ETCC to avoid the consequences of its improper, fraudulent and illegal conduct in the State of

**Ex. 2**

Oklahoma and the United States of America.   Elephant Talk Communications Corp. (ETCC), effected a name change, effective November 1, 2016, to Pareteum (TEUM) who operates from 1185 Avenue of the Americas, New York, New York 10036.

4.     The parties entered into written employment agreements titled: 1) " Consultancy Agreement for a Definite Period of time" ("Consultancy Agreement") **[Exhibit 1]** and 2) "Side Letter to the Consultancy Agreement for a Definite Period of Time"  ("Side Letter") **[Exhibit 2]**.   (Together these two agreements are referenced herein as the "Agreement").

> "In the event of inconsistency between the APA, the Consultancy Agreement, or this Side Letter the terms of the Side Letter shall prevail in the first instance and thereafter the APA will be considered definitive." *Exhibit 2: Side Letter, Bullet Point 4, page 1 of 2 pages.*

> "This Side Letter is subject to the laws of the state of Oklahoma without regard to any choice of law argument" *Exhibit 2: Side Letter, Bullet Point 4, Page 2 of 2 pages.*

5.     The Defendant solicited the employment of the Plaintiff, and drafted the employment Agreement without any negotiation from Plaintiff.   The employment consulting was based from Defendant's global headquarters office in Oklahoma City, and the contract was to be performed in Oklahoma.

6.     This court has jurisdiction and venue is proper in the District Court of Oklahoma County, Oklahoma, which is the residence of the Plaintiff and the global headquarters for the Defendant at all times relevant.

## FACTUAL BACKGROUND

7.     On or about April, 1 2013, both Defendant ETNA and its parent company ETCC entered into an asset purchase agreement ("APA") to purchase the assets of Telnicity, LLC, an Oklahoma Limited Liability Company, with its primary offices located at 9705 N.

Broadway Ext, Suite 200, Oklahoma City, Oklahoma County, Oklahoma. ("Telnicity")

Plaintiff was a consultant to Telnicity prior to the APA.

8.    Telnicity's business assets and operations became the sole initial source of operations in

North America for ETCC, through its wholly owned subsidiary Defendant ETNA.

9.    Telnicity and ETNA's primary business is providing wireless advice and services in

relation to U.S. based wireless carriers, networks, phones and wholesale operations.

10.   Around this same time, ETNA was formed as a Delaware Corporation, and began

operation as the Head Quarters for ETNA in the United States.

11.   Defendant approached Plaintiff, an acknowledged key person with regard to Telnicity,

and offered employment as an operations and finance expert.  Plaintiff, based on the

terms offered, intended and expected to make ETNA his sole employer, and divest from

his unrelated business once the ETNA work initiated.

12.   On or around February 17th, 2013, the parties executed Consultancy Agreement and Side

Letter (together "Agreement").    The terms of the Side Agreement prevail over

conflicting terms of the Consultancy Agreement pursuant an express provision of the

Side Agreement (*See* Exhibit 2: Side Agreement, Page 1, Bullet Point 4).

13.   In the course of the negotiation of the APA, it was fully and openly disclosed to

Defendant and ETCC, both by Plaintiff, as well Telnicity, that Plaintiff was the owner of

an outside fast food franchise unrelated to his full time work for Telnicity.  The franchise

did not and has never competed in any way with Telnicity or the Defendant.

> *"Working hours are flexible, but Consultant [Plaintiff] is expected to work full time and exclusively for Principle or its affiliates" [Exhibit 1: Consultancy Agreement, Bullet Point 7, Page 1 of 6]*

> *"Parties agree to a fixed fee of US$ 13,625 per month. A 1099 form shall be issued to Consultant for these fees" [Exhibit 1: Consultancy Agreement, Bullet Point 1, Page 2 of 6]*

*"Payment of invoices shall be done within 14 days after receipt of the invoice"* *[Exhibit 1: Consultancy Agreement, Bullet Point 3, Page 2 of 6]*

*"For eligibility of commission to apply, it has been agreed in the Asset Purchase Agreement of January 8, 2013 between Telnicity, LLC at one hand and Elephant Talk North America and Elephant Talk Communications Corp. on the other hand. The content of the agreed [sic] is well known to the parties. [Exhibit 1: Consultancy Agreement, "Commission Structure", page 2 of 6.]*

*"At the Principals discretion, principal reimburses staff when additional expenditure over and above the ordinary cost of living is wholly, necessarily and exclusively incurred in the performance of company business, in accordance with its policies. Any staff member (being employee or consultant) is expected to limit expenses as much as possible; ... [Exhibit 1: Consultancy Agreement, "Expenses", page 2 of 6]*

*"The Consultant shall not be permitted to accept or negotiate, whether directly or indirectly, for its or his/her personal benefit any commission, advantage or gain, in any form or under any name whatsoever, from customers or suppliers of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company, <u>except that Consultant remains free to do business with those persons which are the Consultants own customers (independent of this Consultancy agreement) and in such cases only in connection with the Consultant's independent (and non competing) business.</u>*

*"Should the Consultancy Agreement be terminated by the Principal for any reason other than (a) any serious or persistent committed breach of any of the obligations under the Consultancy Agreement by the Consultant or (b) non-performance, Principal will pay out the remaining term of the contract to the Consultant" [Exhibit 1: Consultancy Agreement, "General" Bullet Point 4, Page 6 of 6]*

*"This Consultancy agreement is subject to the laws of the state of Oklahoma without regards to any choice of law argument" [Exhibit 1: Consultancy Agreement, "General" Bullet Point 5, Page 6 of 6]*

14.   The fast food franchise owned by Plaintiff is in no way providing advice or services in relation to U.S. based wireless carriers, networks, phones or wholesale operations. Rather, the Franchise provides fried chicken and various prepared food items to mall patrons in a single mall in Oklahoma City, Oklahoma. The ownership of the fast food franchise was the only stated grounds for "suspension" by Defendants.

15.    The ownership of the Plaintiff's franchise has not, did not, and does not prevent or limit the Plaintiff's ability to perform full time work in the consulting.    Plaintiff has, at all times relevant, hired full time managers and employees to operate the franchise.   Plaintiff performed full time services for Defendant in compliance with the Agreement.

16.    The Agreement provided for the agreement to commence on closing date of the APA, which was anticipated to be March 1, 2013, and shall continue for a period of five years:

> *"Of particular importance to Principal [Defendant ETNA] is that Consultant remains engaged, as a consultant and in any case in total for at lease five (5) years after closing." (See Side Letter, Page 1, Bullet point 2)*

17.    The Express terms of the Side Agreement provide:

> *"Should the Consultancy Agreement be terminated by the Principal [Defendant ETNA] for any reason other than (a) any serious or persistent committed breach of any of the obligations under the Consultancy Agreement by Consultant or (b) non-performance, Principal will pay out the remaining term of the contract to consultant.*

18.    The Agreement provides for a fixed fee in the amount of THIRTEEN THOUSAND SIX HUNDRED TWENTY FIVE DOLLARS ($13,625.00) per month in United States currency.

19.    The Agreement, on its face, provides for total base compensation over sixty months of EIGHT HUNDRED SEVENTEEN THOUSAND AND FIVE HUNDRED DOLLARS ($817,500.00) ("Base Compensation") over its five year term.

20.    The Agreement further provides for Commission to be paid in addition to the Base Compensation calculated pursuant to specific provisions contained in the APA.    The provisions of the APA for such commission are incorporated in the Agreement for this purpose.

21.    The Agreement further provides for expense reimbursement to be paid to Plaintiff for business expenses.

22.  Plaintiff provided full time services beginning January 8, 2013 and continued up until January 31, 2014, at which time Defendant ETNA "suspended" Plaintiff, with no explanation, other than the chicken franchise somehow violated the consulting agreement, and with no response to Plaintiff's request to clarification as to Plaintiff's pay status.  Plaintiff signed the Agreement in February having already worked for approximately one month, been  under the control and direction of Defendants, and having been issued Defendants' business cards and operating as Defendants' employee.

23.  At the time of Defendant ETNA's 'suspension' of Plaintiff, Plaintiff's total wages earned was One Hundred Seventy Three Thousand Six Hundred and Twenty Seven Dollars and 42/00 ($173,627.42) for January 8, 2013 though January of 2014.  Of this amount, One Hundred Forty Nine Thousand Eight Hundred and Seventy Five Dollars ($149,875.00) was earned and owing under written contract.   At that time Plaintiff had received only the sum of Thirty Seven Thousand Five Hundred Dollars ($37,500.00), which was paid late.  As such, on the date of "suspension" Plaintiff was owed back wages in the amount of One Hundred Thirty Six Thousand One Hundred Twenty Seven and 42/100  Dollars ($136,127.42) Plaintiff has not received, and Defendant has refused to pay back wages accrued and owing.

24.  During the time of the accumulation of back wages, Defendants made constant and continuous excuses for non-payment and numerous promises of pending payment. Defendants gave assurances to Plaintiff that the accruing wages would be paid in full. Defendant, as is its practice, attempted to renegotiate the Plaintiff's contract after Defendant's nonperformance, and use the financial impairment caused by Defendant's nonperformance to its advantage and benefit.

25.    For the period beginning upon commencement of employment as a consultant, and until the present, Defendant has failed and refused to reimburse the business expenses incurred and paid by Plaintiff in the course of such employment as a consultant.

26.    For the period beginning upon commencement of the Agreement, and until the present, Defendants have failed and refused to pay any commission as required under the APA as referenced and incorporated in the Agreement.

27.    Defendant ETNA terminated the Agreement without good cause, suspended employment of Plaintiff as a Consultant and ceased paying wages in violation of the express terms of the Side Agreement.   Defendant never paid back wages then owed or business expense reimbursement for Defendants' business expenses paid up to that time.

28.    Plaintiff performed all duties required under the agreement up to the time the Defendant ETNA and ETCC suspended the Agreement.

29.    Defendant acted throughout the term of the Agreement, in bad faith and with malice toward Plaintiff.

30.    Defendants, having executed the APA, and seized the assets, intellectual property and operations of Telnicity, including intellectual property created by Plaintiff, entered into the Agreement with no intention to comply with the terms of the Agreement, including assets, operations and intellectual property requiring the payment of a commission to Plaintiff.

31.    Defendants, through their employees, agents and attorneys, have harassed, tormented and threatened Plaintiff.

32.    Defendants, through its employees, agents and attorneys attempted to suborn perjury by Plaintiff shortly before his "suspension".  Defendants, by and through their employee Michael Hagen, at this time, threatened non-payment of back wages, non payment of

reimbursable expenses, an attack on Plaintiff's character, damage to Plaintiff's financial well-being, unwarranted litigation, and the loss of Plaintiff's outside, unrelated, and non-competing franchise.

33.   Defendants, through their employees, agents and attorneys, have openly and intentionally scattered false, libelous and misleading documents in public so as to create false, libelous, or misleading impressions of the Plaintiff with his neighbors, members of the community and the public.

34.   The CEO of Defendant ETCC, openly and pointedly stated that ETCC never had any intention to comply with the terms and provisions of the Agreement with Plaintiff.

35.   Defendants have made no attempt to comply, settle or compensate Plaintiff at any time relevant.

36.   During dates notated, Plaintiff made contact with members of the board of directors asking them to compel the Defendant CEO to honor the consulting agreement and pay past due amounts. It was determined by the board of directors that the agreement was to be honored and the CEO agreed to make the payments but never followed through by paying compensation to Plaintiff even after the direction of the board of directors. The CEO did not pay Plaintiff, but did pay others, and used numerous false, deceptive and dishonest excuses as to why the payments ordered by the Board where never made to Plaintiff.

**FIRST CAUSE OF ACTION: BREACH OF CONTRACT**

37.   The allegations of Paragraphs 1 through 36 of Plaintiff's Petition are hereby incorporated herein by this reference, and each as if fully set forth herein.

38.     The parties entered into a valid Agreement to hire the consulting services of Plaintiff, including in its terms provisions for confidentiality, non-compete and non-solicitation as consideration for employment and pay;

39.     Plaintiff, at all times relevant, performed all services and requirements of the Agreement;

40.     Defendant ETNA has failed and refused to pay Plaintiff as agreed under the Agreement;

41.     Defendant ETCC has failed and refused to pay commission to Plaintiff as agreed under the Agreement;

42.     Defendants have failed and refused to pay Plaintiff reimbursements for Defendants business expenses as required and agreed under the Agreement;

43.     The Agreement expressly requires payment for the full term of the Agreement unless the Agreement is terminated for cause;

44.     Defendant ETNA's 'suspension' without just cause does not relieve Defendant of its duty to continue to pay Plaintiff the fixed fee owed pursuant to the Adhesion Contract drafted by Defendant;

45.     The Defendants acts and omissions constitute breach of the Agreement;

46.     Defendant ETNA's refusal to pay amounts owed under the Agreement constitute breach of the Agreement;

47.     Defendants actions and omissions constituting breach of contract have harmed and damaged the Plaintiffs' in excess of $780,000.00 in unpaid wages, lost wages, lost commissions and unreimbursed business expenses.

**SECOND CAUSE OF ACTION:  ITENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

48.     The allegations of Paragraphs 1 through 47 are hereby incorporated herein by this reference, and each as if fully set forth herein.

49.    Defendants' actions and omissions were intentional, wreckless and malicious;

50.    Defendants' failure to pay amounts owed for labor performed created extreme, outrageous and unjustified financial hardship on Plaintiff, and Defendant's false statements of pending payment prolonged and exacerbated Plaintiff's suffering.

51.    Defendants' use of their attorneys to harass, badger, threaten and intimidate Plaintiff was intentional and expressly intended to create fear, apprehension and concern in the Plaintiff and his close relations;

52.    Defendants' use of agents, employees and attorneys to intimidate, coerce, and badger Plaintiff was extreme, unlawful, prolonged and outrageous;

53.    Defendant's actions and omissions did in fact create fear, intimidation, and emotional damage to Plaintiff, and created outrageous financial hardship which itself created emotional consequence;

54.    Defendants actions and omissions constituting Intentional Infliction of Emotional Distress have harmed and damaged the Plaintiffs' in excess of $10,000.00.

**THIRD CAUSE OF ACTION:  ACTUAL AND CONSTRUCTIVE FRAUD**

55.    The allegations of Paragraphs 1 through 54 are hereby incorporated herein by this reference, and each as if fully set forth herein.

56.    The Defendants at all times relevant gave false, untrue and deceitful assurances of pending or forthcoming payments to induce Plaintiff (and others) to continue employment under the Agreement.  Plaintiff regularly and continuously communicated with Defendants and his superiors regarding the issues with pay and failure to pay amounts owed.   In fact, it was revealed a few months later that Defendant ETCC/ETNA did not have or allocate sufficient money to pay for the operations during the time the APA and Agreement were signed, or for months thereafter.   Even when Defendants

eventually transferred some funds, the amounts were woefully insufficient to pay all Defendants' outstanding contractual obligations due at the time of transfer, and the transfer occurred only when those obligations were seriously delinquent.

57.   The Defendants demonstratably false assurances and promises to Plaintiff and others that Defendants would pay operating expenses, including past due wages to prolong cooperation with key persons, including Plaintiff, involved with Telnicity.   Such payments were either never made at all, or never made in the amounts promised, and never made in a timely fashion;

58.   Defendant's utilized the time, efforts and cooperation of unpaid or underpaid employees, including the Plaintiff, to facilitate the conversion of Telnicity's assets, relationships and intellectual property to profitable use by Defendants without compensation;

59.   Defendants provided pay (and partial pay) to some key individuals and employees by directing those persons engage specified actions, including opening certain bank accounts, but Plaintiff's conduct of those same procedures, and in strict compliance with those same instructions, resulted in no payments made to Plaintiff;

60.   Defendants knew that Plaintiff relied upon their false promises and misleading statements, and continued to work full time, and in full cooperation until his suspension despite substantial underpayment of wages and reimbursements then due and owing;

61.   Defendants instructed personnel to withhold or deny payments for wages and reimbursements for expenses, while deceitfully stating to Plaintiff that payment of past due amounts was being arranged;

62.   Defendants falsely stated to Plaintiff that required payments had been made for his benefit, but had been withheld against their instructions;

63.   Defendants entered into the APA as well as the Agreement with Plaintiff with no intention of complying with its terms, or payment amounts promised to Plaintiff in those contracts;

64.   Plaintiff reasonably relied on the deceitful, malicious, false and misleading statements of Defendants, who are a globally operated, New York Stock Exchange traded company, to his detriment and loss;

65.   Defendants' intended that Plaintiff rely on their fraudulent actions and omissions, and intended to deceive and mislead Plaintiff.   Defendants have not at any time made any attempt to pay promised back payments or amounts previously promised to be paid.

66.   Plaintiff was damaged as the result of Defendant's actions and omissions in an amount in excess of $780,000.00.

**FOURTH CAUSE OF ACTION:  DECEIT AND FRAUD IN THE INDUCEMENT**

67.   The allegations of Paragraphs 1 through 66  are hereby incorporated herein by this reference, and each as if fully set forth herein.

68.   The Defendants actions and omissions in promising payments and entering into contractual agreements which defendants did not, and never intended to comply, were intentional, malicious and calculated to harm Plaintiff as well as others.

69.   The Defendants, capitalizing on Plaintiff Brown's good faith, by making continued false promises and misrepresentations, prolonged and exacerbated the benefits of their wrongdoing.

70.   The Defendants, having achieved profitability taken, utilized, converted, transitioned, integrated, studied, removed and otherwise utilized for their own purposes and benefits, the assets of Telnicity, and all without having paid any money for those assets as agreed. Defendant induced the former employees of Telnicity, expressly including the Plaintiff,

12

through fraudulent employment contracts, to assist Defendants' efforts to wrongfully take and secure those assets for Defendants own profit and benefit.

71.    Plaintiff Brown relied on the promises of payments and false contractual provisions drafted by Defendants in his decision to enter into the Agreements and provide consulting services and intellectual property.

72.    Plaintiff's reliance upon the Defendants, continuing, repeated, willful, calculated and intentional deceptions, including knowing and intentionally issuing false promises of forthcoming and pending payments, and pending compliance with contractual requirements, was reasonable and an honest extension of Plaintiff's continuing good faith.

73.    Defendants, through their officers, agents, employees and attorneys actively concealed their dishonest and deceitful intentions despite repeated requests and confrontations by Plaintiff. Further, Defendants' demanded Plaintiff engage in false, improper and illegal conduct, and provide false testimony, in order to falsely deny and wrongfully conceal Defendants' misconduct with regard to other employees and contractors.    Further, as proof of the pattern of Defendants' improper practices, Defendant ETNA has already been found liable in one such case due to its identical failure and refusal to pay wages and compensation owed to another former employee.  That judgment remains unsatisfied to this date.

74.    Defendants' actions and omissions constituting Deceit, and Fraud in the Inducement have harmed and damaged the Plaintiffs' in excess of $780,000.00.

## FIFTH CAUSE OF ACTION:   ILLEGALITY AND VIOLATION OF OKLAHOMA WAGE AND LABOR LAW

75.   The allegations of Paragraphs 1 through 74 are hereby incorporated herein by this reference, and each as if fully set forth herein.

76.   Plaintiff performed labor for Defendant ETNA as a Consultant and employee;

77.   Plaintiff has not been paid expense reimbursement, salary, fixed fee or commission in compliance with Oklahoma Law

78.   Defendants actions and omissions constitute violations of applicable federal and state statutes, rules and regulations.  Defendant's actions and omissions were wrongful and actionable as violation of Oklahoma Public Policy.

79.   Plaintiff's were damaged as the result of Defendant's actions and omissions in an amount in excess of $780,000.

## SIXTH CAUSE OF ACTION:  UNFAIR TRADE PRACTICES AND VIOLATION OF OKLAHOMA STATUES

80.   The allegations of Paragraphs 1 through 79 are hereby incorporated herein by this reference, and each as if fully set forth herein.

81.   Defendants, in violation of 15 Okla. Stat. § 753, knowingly made false or misleading representations to Plaintiff, and induced Plaintiff to provide benefits and services in relation Defendants' purchase of the assets of Telnicity;

82.   Defendants obtained, by misrepresentation, property and the proprietary and confidential business information of Plaintiff for wrongful use by Defendant;

83.   Defendants knowingly and intentionally violated 15 Okla.Stat. § 752 subparts 13, 14, and 16, and Plaintiff is entitled under Oklahoma Law to a private action for recovery.

84.     Plaintiff's were damaged as the result of Defendant's actions and omissions in an amount in excess of $780,000.00 and is entitled to statutory damages, attorney fees and costs.

**SEVENTH CAUSE OF ACTION: PUNANTIVE AND STATUTORY DAMAGES**

85.     The allegations of Paragraphs 1 through 84 are hereby incorporated herein by this reference, and each as if fully set forth herein.

86.     The Defendants have greatly profited from the relationships and business information provided by and created for Defendants by Plaintiff Brown;

87.     The Defendants, capitalizing on Plaintiff Brown's good faith, have prolonged and exacerbated the benefits of their wrongdoing.

88.     The Defendants, having achieved profitability taken, transitioned, integrated, studied, removed and otherwise utilized for their own purposes and benefits, the assets of Telnicity, and all without having paid any money for those assets as agreed.  Defendant induced the former employees of Telnicity, expressly including the Plaintiff, through fraudulent employment contracts, to assist Defendants' efforts to wrongfully take and secure those assets for Defendants own profit and benefit.

89.     The Defendants were at all times fully aware of the benefits created by Plaintiff, and acted and continue to act to capitalize on its misconduct toward Plaintiff and others.

90.     The Defendants are and haven been brazen and aggressive in their knowledge of wrongdoing, and continue to act to harm Plaintiff and wrongfully withhold payments due and owing.

91.     Defendant's have at all times relevant controlled the books, records and conduct of Defendants.

92.     Defendants, in their acts and omissions, violated Oklahoma Law and Oklahoma Public Policy.

93.    Defendants Agreement is a contract of adhesion, and contains a "penalty" provision expressly in violation of Oklahoma Statute 15 Okla. Stat. §213. *[Exhibit 1: Consultancy Agreement, "Penalty", page 5 of 6]*

94.    The Plaintiff is entitled pursuant to Oklahoma Law to punitive damages as the result of the intentional and malicious conduct of the Defendants, or in the alternative, Defendants wanton and reckless disregard of the Plaintiffs rights.

**EIGHTH CAUSE OF ACTION:  BREACH OF FIDUCIARY DUTY**

95.    The allegations of Paragraphs 1 through 94 are hereby incorporated herein by this reference, and each as if fully set forth herein.

96.    Defendant ETNA, acting through its officers and directors has a fiduciary duty to employees and contractors.

97.    Defendants created a relationship of faith and trust between Defendants and the principals of Telnicity by and through the APA, and the purchase of Telnicity's assets and operations.

98.    Defendants', including their officers, employees, agents and attorneys conduct, acts and omissions constitute a breach of fiduciary duty;

99.    Plaintiff Brown suffered actual damages, including loss compensation, lost of funds and assets paid towards the expenses of Defendants, and loss of commission promised to Plaintiff on assets stolen from Telnicity, but created, in whole or in part, by Plaintiff.

100.   The Defendants directly benefited from their wrongful actions and improper omissions;

101.   Plaintiff was damaged as the result of Defendant's actions and omissions in an amount in excess of $10,000 including attorney fees and costs of the action.

## NINETH CAUSE OF ACTION:  CONVERSION

102.   The allegations of Paragraphs 1 through 101 are hereby incorporated herein by this reference, and each as if fully set forth herein.

103.   Defendants by the actions and omissions of its officers, employees, agents, contractors and attorneys, held, diverted and converted property, funds and proceeds for the use of assets for which compensation was due and owing to Plaintiff;

104.   Defendant, through their employees, officers, employees, contractors, agents and attorneys wrongfully obtained, utilized seized and interfered with the intellectual property and proprietary information of Plaintiff, including but not limited to the wrongful use of Plaintiff's services and labor deceit.

105.   Plaintiff was directly damaged by the loss and theft;

106.   Plaintiff was damaged as the result of Defendants' actions and omissions in an amount in excess of $780,000.00.

## TENTH CAUSE OF ACTION:  QUANTUM MERITUM/UNJUST ENRICHMENT

107.   The allegations of Paragraphs 1 through 106 are hereby incorporated herein by this reference, and each as if fully set forth herein.

108.   Plaintiff argues in the alterative, that the Agreement is an instrument of fraud, is void, or is invalid on the basis of the failure of consideration;

109.   Plaintiff conferred  in good faith, and in reliance upon a invalid contract, its services and have received Plaintiff's months of services, and contributions to Defendant's business expenses;

110.   Defendant knowingly, intentionally, and willing accepted the labor, efforts, contributions and benefits conferred by Plaintiff;

111.   Defendant's have profited and benefited from the Plaintiff's efforts, labor and contributions of money paid for the expenses of Defendant;

112.   Defendants prolonged, wrongfully induced and continued employment without pay or reimbursement is unjust and inequitable under the principals of the laws of Oklahoma. Defendants have willfully and intentionally refused to relinquish or surrender the assets or the fair value of efforts.

113.   Plaintiff acted legally, in good faith and without guile, improper motive, or deceit. Plaintiff is entitled the fair value for its services, labor and debts incurred in reliance upon the Agreement, loss of use of its assets and loss of profits occasioned by Defendant's prolonged, wrongful and improper conduct;

114.   Defendants utilized false promises, guile and deceit to prolong and induce Plaintiff to contribute personal assets to Defendant's expenses, and to continue work and efforts for the direct benefit of Defendant.

115.   Defendants taking, use and continuing use and benefits constitute Unjust Enrichment and have harmed and damaged the Plaintiffs' in excess of $98,700 in payment for services and in excess of $185,000.00 for amounts paid for deposits, rent and business expenses paid on behalf of Defendant.

WHEREFORE, Plaintiffs prays this honorable Court grant them judgment against Defendant in the principal amount of in excess of TEN THOUSAND DOLLARS plus interest at the contractual rate, all costs of collection including a reasonable attorney fee pursuant to 12 Okla. Stat. § 936, and such other relief as the Court deems just and equitable.

*Respectfully submitted:*

John M. Gibson, OBA #16058
Attorney for Plaintiff.
4334 NW Expressway, Suite 220
Oklahoma City, OK 73120
(405) 283-4848
(972) 421-1885 (Facsimile)

STATE OF OKLAHOMA     ]
                        ]    SS
COUNTY OF OKLAHOMA   ]

## VERIFICATION

I, Stephen Brown, an Individual, being first duly sworn upon oath, allege and state that I have read the above and foregoing Amended Petition, am familiar with the contents thereof, and that the facts and matters stated therein, are true and correct.

Stephen Brown, an individual

Subscribed and sworn before me, a Notary Public in and for the State of Oklahoma, on this the 20th day of October 2015. July 2018

NOTARY PUBLIC
Commission Number: 17006669
My Commission Expires: 07/20/2021

EMARI HITE
IN AND FOR
#17006669
EXP. 07/20/2021
STATE OF OKLAHOMA
NOTARY PUBLIC

**Elephant Talk
North America Corp**

ElephantTalk 

## CONSULTANCY AGREEMENT FOR A DEFINITE PERIOD OF TIME
## BETWEEN THE UNDERSIGNED:

### ON THE ONE HAND

**Elephant Talk North America Corp,** for the purpose of this agreement located at Ellenoff Grossman & Schole LLP, 150 East 42nd Street, New York, New York 10017, a company being incorporated under the laws of the US, legally represented by Alex Vermeulen, General Attorney, hereinafter referred to as the **"Principal"**;

### AND ON THE OTHER HAND

**Stephen Brown,** being for the time being an independent contractor and existing under US Law with an address at 12801 Country Hollow Rd, Oklahoma City, OK, 73142, United States of America, Hereinafter referred to as the **"Consultant"**,

Jointly referred to as: the **"Parties"**;

### WHEREAS:

The Consultant is an operations and finance expert, providing advice and services in relation to U.S. based wireless carriers networks, phones, and wholesale operations.

The Parties wish to enter into a Consultancy agreement and wish to lay down the terms and conditions of this Consultancy agreement.

HAVE AGREED AS FOLLOWS:

### COMMENCEMENT, DURATION AND TERMINATION

- This agreement shall commence on Closing Date of the Asset Purchase Agreement, anticipated to be March 1st 2013 and shall continue for 12 months unless terminated earlier by either Party by giving thirty (30) days' written notice of termination or as otherwise provided in this agreement. If not terminated, it will continue automatically for additional periods of 12 month.
- The Principal may terminate this agreement forthwith by written notice to the Consultant if the Consultant shall commit any serious or persistent breach of any of its obligations under this Agreement.

### AGREED SERVICES

- The Consultant will provide services for the Principal and its affiliates.
- The Consultant shall execute the services in accordance with the instructions of the Principal or its affiliates and shall further uphold the interests of the Principal to the utmost of his powers, skill and ability.
- Given the special qualifications of the Consultant, no replacement or substitution can take place without prior written consent of the Principal.
- Business travelling may be necessary to Principal's offices or equipment locations.

### TIME OF DEDICATION

- Working hours are flexible, but the Consultant is expected to work full time and exclusively for the Principal or its affiliates.
- Although it is agreed that Consultant is not an employee, he nevertheless can take time off for vacation, not to exceed four weeks per year, and for all US Federal Holidays. There shall be no reduction in Consultant's remuneration for such days off.

**EXHIBIT
1**

Sign Principal ........                     Page 1 of 6

**Elephant Talk
North America Corp**

ElephantTalk 

## FEE

- Parties agree to a fixed fee of US$ 13,625.00 per month. A 1099 form shall be issued to Consultant for these fees.
- Consultant will send an invoice to the Principal within 1 week after the end of a month, including a specification of the days worked.
- Payment of invoices will be done within 14 days after receipt of the invoice.

## COMMISSION STRUCTURE

For eligibility of commission to apply; it has been agreed in the Asset Purchase Agreement of January 8, 2013 between Telnicity, LLC at one hand and Elephant Talk North America Corp. and Elephant Talk Communications Corp. on the other hand.  The content of the agreed is well known to Parties.

Calculating and measuring commission is done on quarterly base and is made in arrears; cancellations and charges to revenue will be applied as a deduction to the relevant component in the quarter the charge is processed and commission is due only upon acceptance and payment of the invoice by the customer. Any commission allocation during any enrolling fiscal year is as such also to be assigned an advanced payment only; after the yearly financial audit only, can commission allocation numbers for the foregoing fiscal be finalized and if needed, settled.

Where collaboration (of any kind) between the Principal and Consultant ceases for whatever reason; under no circumstances will there be any further commission award payment be made by Principal after the date of notice or the actual date of termination, whichever is the earlier, regardless of performance up to that date; the Consultant forfeits all rights to any bonus.

## EXPENSES

At the Principal's discretion, principal reimburses staff when additional expenditure over and above the ordinary cost of living is wholly, necessarily and exclusively incurred in the performance of company business, in accordance with its policies. Any staff member (being employee or consultant) is expected to limit expenses as much as possible; cost of transportation will be reimbursed on the basis of lowest fare/economy class public transport. Only on the basis of economic or efficiency considerations, use can be made of taxi, company (lease) car or own car. The amount of expenses claimed must have actually been incurred for the purpose/s stated in any claim.

Expense reimbursement rates (e.g. rate per mile or kilometer, maximum hotel room rate etc.) will be updated as required by the Finance department and communicated as necessary. The rate to use when translating foreign currency transactions into the currency of reimbursement will always be the rate shown on and used by the company's financial system at the time of submission.

The following categories of expenses will explicitly not be reimbursed (this list is not exhaustive);
- those claims not supported by fully documented receipts (note that credit card slips or statements do not count as documented receipts), unless exceptional approval has been given by the appropriate Department Head and that approval is attached to the claim
- personal entertainment of any sort
- membership costs for frequent flyer, frequent traveler or airline club programs
- annual subscriptions to a Professional Body
- car wash/car valeting (unless specifically, for highly exceptional and fully specified reasons, authorized by the appropriate Department Head and attached to the claim)
- minibar/bar bills
- entertaining other ET staff (unless specifically pre-authorized by the appropriate Department Head and attached to the claim)

## Elephant Talk
## North America Corp

ElephantTalk 

- habitual claims for unidentified small items of expenditure on a given day, or on a series of days, under the 'sundries' column of the expense claim form, or for multiple ongoing expenses below documentation-required levels, but where documentation could reasonably be expected.

A supporting, fully documented and itemized receipt for any expense incurred must be attached to the expense claim form in all cases where these are normally obtainable, unless particular circumstances make that difficult. If tax is paid the receipt should show the sales tax (VAT) split. Credit card receipts or billing statements are generally not acceptable by themselves unless they are the only available documentation. If a detailed receipt is not provided, a brief written explanation of why a receipt was not obtained must be submitted with the expense reimbursement form. Exceptional approval to reimburse may then be required.

### INDEMNIFICATION

The Consultant guarantees the Principal that it will assume all liabilities that arise out of this Consultancy agreement such as wage taxes and social premiums to be paid for by the Consultant through the consultants company. To that extent, the Consultant will provide proof to the Principal that these taxes and levies are duly paid and herewith indemnify Principal from any responsibility as to wage taxes, social premiums and other relevant mandatory levies.

### BUSINESS EQUIPMENT

The Consultant may have business equipment put at his disposal by the Principal in order to execute its obligations under this agreement with the Principal or otherwise in pursuance of its business relationship with the Principal. The Consultant will take every reasonable step to ensure the safety and security of provided business equipment both at the office and away from it. The Consultant accepts the obligations;
- to use the equipment only for the purpose that it is designated for and not to make the equipment to third parties within business reason;
- to allow The Principal to check the equipment's condition at all times;
- to use the business equipment with "due care and diligence".

When damaged, stolen or lost, the circumstances will dictate who ultimately bears the financial responsibility, such reasonably to be determined by the Principal. The basic rule of thumb is that any business equipment placed at the disposal of the Consultant should be treated exactly as if privately owned (for example leaving business equipment on desks or in unlocked cupboards overnight is clearly irresponsible, as is leaving such items in clear view in a car). It is essential that any damage, theft or loss of is reported as soon as it is discovered. Local police must always be informed immediately, and a crime reference number obtained for possible insurance purposes.

Upon the termination of this agreement or on the demand of the Principal, the Consultant shall promptly return to the Principal all the documents and other items relating to the Principal (both originals and copies), including, but not limited to, drawings, blueprints, folders, financial documents, marketing items, client lists, client and customer information, reference books and business plans. The Principal is considered to be the owner of such documents and other items. The Consultant undertakes not to keep copies of the above information without the prior written consent of the Principal.

Upon the termination of this agreement or on demand of the Principal, the Consultant will cooperate in taking measures which guarantee a smooth transmission up to the last day of work.

### INTELLECTUAL AND INDUSTRIAL PROPERTY RIGHTS

The Consultant expressly covenants that all discoveries, inventions, improvements and developments relating in any way to the business activities of the Principal which may be discovered, invented, improved or developed by the Consultant during the contractual period, whether and where so ever discovered, invented, improved or developed, will be the exclusive and sole property of the Principal. The Consultant must disclose

**Elephant Talk
North America Corp**

ElephantTalk 

promptly to the Principal and hereby assigns to the Principal without further compensation, all rights, title and interest in the said discoveries, inventions, improvements and developments whether conceived or developed by him solely or jointly with others and will on the request of the Principal execute all documents and do all such things as may be requested by the Principal to confirm or perfect the rights, title and interest in such property provided that the Principal will bear all costs and expenses associated therewith.

The Consultant hereby unconditionally transfer to the Principal all intellectual property rights created during the term of this Consultancy agreement and relating in any way to the business activities of the Principal (including but not limited to any future copyrights, trademarks and patents, as well as knowhow and trade secrets contained in or relating the software, documentation or other works or materials), and the Principal hereby accepts these IP-rights.

Notwithstanding the forgoing, The Consultant hereby unconditionally assign and transfers to the Principal in perpetuity all present and future rights, title and interests in all works as defined in the Copyright Act in all countries throughout the world, created by him whilst doing any act or carrying out any task, whether alone or together with other persons, during the contractual period, including without limitation:
1. All the rights that a copyright owner has under the Copyright Act and under any similar legislation in any country;
2. The right to apply for and maintain design, copyright, trade mark or patent registration; and
3. The right to sue for past infringements.
4. Any moral rights that he may hold in such works. In this respect the Consultant consents to:
   a. The alteration and variation in any manner of such works; and
   b. The use of such works without any attribution of authorship.

Insofar as the abovementioned transfer of any future intellectual property rights (including but not limited to a copyright under any relevant Copyright Act) is not yet completed through this agreement, Consultant shall upon Principal's first request undertake to assign these future intellectual property rights to the Principal by signing all required documents and render all other necessary cooperation thereto. Consultant hereby give power of attorney to the Principal to execute all required documents and acts, as referred to this article, in the name of the Principal.

The provisions of this contract shall not include Open Source software developed by the Consultant during the term of the contract provided such Open Source software is

1. Indeed Open Source;
2. Developed independently by the Consultant and/or Consultant on their own time and equipment;
3. Not connected to the Principal, its clients, or any pending development task within the Principal's business without prior written permission.

The Consultant agrees to unconditionally disclose all software and source codes to the Principal immediately upon its creation.

## SECRECY

The Consultant shall not, during the term of this Consultancy agreement and thereafter, disclose to any third party or use for his/her own benefit any of the business of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company which have become known to the Consultant and/or Consultant. The term "business" includes, without limitation, all business, organizational and technical knowledge, software, source codes, know-how, proprietary or confidential information, names or addresses of customers of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company and any other information which is known only to a limited number of persons and which is not intended to become known outside the company of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company.

Sign Principal

Sign Consultancy

**Elephant Talk
North America Corp**

ElephantTalk 

All written and other records and all tangibles concerning the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company and its business which are in the possession of the Consultant and/or Consultant shall be carefully kept and shall be immediately returned to the Principal upon its request, and in any case upon the termination of the Consultancy agreement. The Consultant hereby waives any right of retention in respect of records and tangibles referred to in this article.

Consultant agree that its obligations hereunder are necessary and reasonable in order to protect the Principal and the Principal's business, and expressly agree that monetary damages could be inadequate to compensate the Principal for any breach of the obligation set forth in this article. Accordingly, Consultant agree and acknowledges that any such violation or threatened violation will cause irreparable injury to the Principal and that, in addition to any other remedies that may be available, in law, in equity or otherwise, the Principal shall be entitled to obtain injunctive relief against the threatened breach of this obligation or the continuation of any such breach, without the necessity of proving actual damages.

## PERSONAL GAIN

The Consultant shall not be permitted to accept or negotiate, whether directly or indirectly, for its or his/her personal benefit any commission, advantage or gain, in any form or under any name whatsoever, from customers or suppliers of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company, except that the Consultant remains free to do business with those persons which are the Consultant's own customers (independent of this Consultancy agreement) and in such cases only in connection with the Consultant's independent (and non-competing) business.

## NON-COMPETITION

The Consultant shall not, during the term of this Consultancy agreement or during a period of 24 months after the termination of this Consultancy agreement, without prior written consent of the Principal:

a. be engaged in any work or activity, equal to that of the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company, whether as owner, stockholder, partner, officer, Consultant, employer or otherwise;

b. employ, solicit or endeavor to entice away from the Principal or any of its subsidiaries or affiliated companies or the Principal's parent company any person who is or was part of its staff (as an employee or an independent contractor) o during some part of the term of this Consultancy agreement.

c. directly or indirectly, contact or solicit any designated customers of the Principal or any of its subsidiaries or affiliated companies for the purpose of selling to the designated customers any services or products which are the same as or substantially similar to, or in any way competitive with, the services or products sold by the Principal or any of its subsidiaries or affiliated companies. For the purpose of this section, a designated customer means a person or legal entity who was a customer of Principal or of any of its subsidiaries or affiliated companies during some part of the term of this Consultancy agreement.

## PENALTY

The Consultant acknowledges that a breach or threatened breach by the Consultant of the provisions of one of the above articles regarding secrecy, personal gain and non-competition, may result in the Principal and its shareholders suffering irreparable harm which is not capable of being calculated and which cannot be fully or adequately compensated by the recovery of damages alone. Accordingly, Interim Consultant agrees that the Company shall be entitled to interim and permanent injunctive relief, specific performance and other equitable remedies, in addition to any other relief to which the Company may become entitled.

Nonetheless and in addition, if the Consultant commits a breach on one of the above articles regarding secrecy, personal gain and non-competition, he shall owe the Principal, without any notice of default being required, a penalty reflecting at least all actual damages - for each day that the breach continues, in addition to any other remedies that may be available, in law, in equity or otherwise to claim full compensation for all damages suffered by the Principal as a consequence of the breach.

**Elephant Talk
North America Corp**

 ElephantTalk

## ADDITIONAL CONDITIONS AND STIPULATIONS

Attached conditions are the Principal's existing and/or future governance schemes and policies which the Consultant acknowledges (and will execute the necessary acknowledgement documents) and with which the Consultant agrees. In particular are mentioned:
- Code of Business Conduct
- Insider Trading Policy
- Whistle-blower
- Time-off policy

The Consultant will give the Principal permission to collect, retain and process personal information, which will be held and processed in accordance with the data protection principles and will be used solely for the administration and management of the Principal.

## GENERAL

- This agreement and any attachments and/or addendums shall embody all the terms of this Agreement. Any amendments or additions to this Consultancy agreement shall be in writing.
- Should any provision of this Consultancy agreement be or become invalid, the validity of the other provision(s) shall not be affected thereby.
- Consultant shall inform the Principal immediately of any change of address.
- Should the Consultancy Agreement be terminated by the Principal for any reason other than (a) any serious or persistent committed breach of any of the obligations under the Consultancy Agreement by the Consultant or (b) non-performance, Principal will pay out the remaining term of the contract to consultant.

- This Consultancy agreement is subject to the laws of the state of Oklahoma without regards to any choice of law argument.

This Agreement shall be signed in 2 (two) original copies or may be executed by Parties signatures transmitted by facsimile or electronic format, and copies of this Agreement so executed and delivered shall have the same force and effect as originals.

*February 17ᵗʰ 2013*

Principal

Alex Vermeulen,
General Attorney

Consultant / contractor

Stephen Brown

Sign Principal

Page 6 of 6

Sign Consultancy

**Elephant Talk
North America Corp**

ElephantTalk 

## SIDE LETTER

## TO THE CONSULTANTCY AGREEMENT FOR A DEFINITE PERIOD OF TIME

## BETWEEN THE UNDERSIGNED:

### ON THE ONE HAND

**Elephant Talk North America Corp,** for the purpose of this agreement located at Ellenoff Grossman & Schole LLP, 150 East 42nd Street, New York, New York 10017, a company being incorporated under the laws of the US, legally represented by Alex Vermeulen, General Attorney, hereinafter referred to as the **"Principal"**;

### AND ON THE OTHER HAND

**Stephen Brown,** being for the time being an independent contractor and existing under US Law with an address at 12801 Country Hollow Rd, Oklahoma City, OK, 73142, United States of America, Hereinafter referred to as the **"Consultant"**,

Jointly referred to as: the **"Parties"**;

### WHEREAS:

The Parties following the conclusion of an Asset Purchase Agreement dated 8 January 2013 **("APA")** have agreed to work together in good faith to deliver the business goals intended by said APA.

It is expected that the APA will become fully effective at Closing Date, anticipated to be on or around March 1, 2013

The Consultant is being engaged by Principal as an independent contractor pursuant to a **"Consultancy Agreement"** starting at Closing Date.

The Parties wish to enter into this **"Side Letter"** to lay down the terms and conditions applicable to their relationship, insofar as these matters are not governed by any other agreement.

### HAVE AGREED AS FOLLOWS:

- The Consultancy Agreement shall commence on Closing Date and shall continue in full force and effect until at least 5 years thereafter unless deemed not compliant. In case it may be deemed not compliant, the Consultancy Agreement will be rolled over into an employment agreement at will, with substantially resulting into the same terms as this Consultancy Agreement, corrected for all financial and all other consequences.

- Of particular importance to Principal is that Consultant remains engaged, as a consultant and in any case in total for at least five (5) years after Closing Date.

- Accordingly, the Parties agree that the non-competition, non-solicitation, confidentiality, intellectual property and other relevant provisions contained in the Consultancy Agreement and/or the Employment Agreement shall remain effective and in force for at least five (5) years from the date hereof (or longer if so stated) and/or two (2) years after termination of consultant contract and that discretionary entitlements (if any) will be contingent on the continuous service for said duration.

- In the event of an inconsistency between the APA, the Consultancy Agreement, or this Side Letter the terms of this Side Letter shall prevail in the first instance and thereafter the APA will be considered definitive.

- Should the Consultancy Agreement be terminated by the Principal for any reason other than (a) any serious or persistent committed breach of any of the obligations under the Consultancy Agreement by the Consultant or (b) non-performance, Principal will pay out the remaining term of the contract to consultant.

Sign Elephant Talk ......   Page 1 of 2   **EXHIBIT 2**   Sign

**Elephant Talk
North America Corp**

ElephantTalk 

## GENERAL PROVISIONS

- Unless otherwise expressly stated, this Side Letter and any attachments and/or addenda shall embody all the terms of this Agreement. Any amendments or additions to this Side Letter shall only be effective if in writing signed by both Parties.

- Should any provision of this Consultancy agreement be or become invalid, the validity of the other provision(s) shall not be affected thereby.

- Consultant shall inform the Principal immediately of any change of material fact which may be relevant to their legal relationship.

- This Side Letter is subject to the laws of the state of Oklahoma without regards to any choice of law argument.

This Agreement shall be signed in 2 (two) original copies or may be executed by Parties signatures transmitted by facsimile or electronic format, and copies of this Agreement so executed and delivered shall have the same force and effect as originals.

*February 17ᵗʰ 2013*

Principal
Alex Vermeulen,
General Attorney.

Consultant / Contractor
Stephen Brown